Justice Thomas,
concurring in part and concurring in the judgment.
I agree with the Court that the Fourteenth Amendment makes the right to keep and bear arms set forth in the Second Amendment “fully applicable to the States.” Ante, at 750. I write separately because I believe there is a more straightforward path to this conclusion, one that is more *806 faithful to the Fourteenth Amendment’s text and history. I therefore do not join Parts II-C, IV, and V of the principal opinion.
Applying what is now a well-settled test, the Court concludes that the right to keep and bear arms applies to the States through the Fourteenth Amendment’s Due Process Clause because it is “fundamental” to the American “scheme of ordered liberty,” ante, at 767 (citing Duncan v. Louisiana, 391 U. S. 145, 149 (1968)), and “ 'deeply rooted in this Nation’s history and tradition,’ ” ante, at 767 (quoting Washington v. Glucksberg, 521 U. S. 702, 721 (1997)). I agree with that description of the right. But I cannot agree that it is enforceable against the States through a Clause that speaks only to “process.” Instead, the right to keep and bear arms is a privilege of American citizenship that applies to the States through the Fourteenth Amendment’s Privileges or Immunities Clause.
I
In District of Columbia v. Heller, 554 U. S. 570 (2008), this Court held that the Second Amendment protects an individual right to keep and bear arms for the purpose of self-defense, striking down a District of Columbia ordinance that banned the possession of handguns in the home. Id., at 635. The question in this case is whether the Constitution protects that right against abridgment by the States.
As the Court explains, if this case were litigated before the Fourteenth Amendment’s adoption in 1868, the answer to that question would be simple. In Barron ex rel. Tiernan v. Mayor of Baltimore, 7 Pet. 243 (1833), this Court held that the Bill of Rights applied only to the Federal Government. Writing for the Court, Chief Justice Marshall recalled that the founding generation added the first eight Amendments to the Constitution in response to Antifederalist concerns regarding the extent of federal — not state — power, and held that if “the framers of these amendments [had] intended them to be limitations on the powers of the state govern *807 ments,” “they would have declared this purpose in plain and intelligible language.” Id., at 250. Finding no such language in the Bill of Rights, Chief Justice Marshall held that it did not in any way restrict state authority. Id., at 248-250; see Lessee of Livingston v. Moore, 7 Pet. 469, 551-552 (1833) (reaffirming Barron’s holding); Permoli v. Municipality No. 1 of New Orleans, 3 How. 589, 609-610 (1845) (same).
Nearly three decades after Barron, the Nation was splintered by a civil war fought principally over the question of slavery. As was evident to many throughout our Nation’s early history, slavery, and the measures designed to protect it, were irreconcilable with the principles of equality, government by consent, and inalienable rights proclaimed by the Declaration of Independence and embedded in our constitutional structure. See, e. g., 3 Records of the Federal Convention of 1787, p. 212 (M. Farrand ed. 1911) (remarks of Luther Martin) (“[S]lavery is inconsistent with the genius of republicanism, and has a tendency to destroy those principles on which it is supported, as it lessens the. sense of the equal rights of mankind” (emphasis deleted)); A. Lincoln, Speech at Peoria, Ill. (Oct. 16, 1854), reprinted in 2 The Collected Works of Abraham Lincoln 266 (R. Basler ed. 1953) (“[N]o man is good enough to govern another man, without that other’s consent. I say this is the leading principle — the sheet anchor of American republicanism. . . . Now the relation of masters and slaves is, pro tanto, a total violation of this principle”).
After the war, a series of constitutional amendments were adopted to repair the Nation from the damage slavery had caused. The provision at issue here, § 1 of the Fourteenth Amendment, significantly altered our system of government. The first sentence of that section provides that “[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.” This unambiguously overruled this Court’s contrary holding in Dred Scott v. Sand- *808 ford, 19 How. 393 (1857), that the Constitution did not recognize black Americans as citizens of the United States or their own State. Id., at 405-406.
The meaning of § l’s next sentence has divided this Court for many years. That sentence begins with the command that “[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.” On its face, this appears to grant the persons just made United States citizens a certain collection of rights— i. e., privileges or immunities — attributable to that status.
This Court’s precedents accept that point, but define the relevant collection of rights quite narrowly. In the Slaughter-House Cases, 16 Wall. 36 (1873), decided just five years after the Fourteenth Amendment’s adoption, the Court interpreted this text, now known as the Privileges or Immunities Clause, for the first time. In a closely divided decision, the Court drew a sharp distinction between the privileges and immunities of state citizenship and those of federal citizenship, and held that the Privileges or Immunities Clause protected only the latter category of rights from state abridgment. Id., at 78. The Court defined that category to include only those rights “which owe their existence to the Federal government, its National character, its Constitution, or its laws.” Id., at 79. This arguably left open the possibility that certain individual rights enumerated in the Constitution could be considered privileges or immunities of federal citizenship. See ibid, (listing “[t]he right to peaceably assemble” and “the privilege of the writ of habeas corpus” as rights potentially protected by the Privileges or Immunities Clause). But the Court soon rejected that proposition, interpreting the Privileges or Immunities Clause even more narrowly in its later cases.
Chief among those cases is United States v. Cruikshank, 92 U. S. 542 (1876). There, the Court held that members of a white militia who had brutally murdered as many as 165 black Louisianians congregating outside a courthouse had *809 not deprived the victims of their privileges as American citizens to peaceably assemble or to keep and bear arms. Ibid.; see L. Keith, The Colfax Massacre 109 (2008). According to the Court, the right to peaceably assemble codified in the First Amendment was not a privilege of United States citizenship because “[t]he right . . . existed long before the adoption of the Constitution.” 92 U. S., at 551 (emphasis added). Similarly, the Court held that the right to keep and bear arms was not a privilege of United States citizenship because it was not “in any manner dependent upon that instrument for its existence.” Id., at 553. In other words, the reason the Framers codified the right to bear arms in the Second Amendment — its nature as an inalienable right that pre-existed the Constitution’s adoption — was the very reason citizens could not enforce it against States through the Fourteenth.
That circular reasoning effectively has been the Court’s last word on the Privileges or Immunities Clause.[1] In the intervening years, the Court has held that the Clause prevents state abridgment of only a handful of rights, such as the right to travel, see Saenz v. Roe, 526 U. S. 489, 503 (1999), that are not readily described as essential to liberty.
As a consequence of this Court’s marginalization of the Clause, litigants seeking federal protection of fundamental rights turned to the remainder of § 1 in search of an alternative fount of such rights. They found one in a most curious place — that section’s command that every State guarantee “due process” to any person before depriving him of “life, liberty, or property.” At first, litigants argued that this Due Process Clause “incorporated” certain procedural rights codified in the Bill of Rights against the States. The Court *810 generally rejected those claims, however, on the theory that the rights in question were not sufficiently “fundamental” to warrant such treatment. See, e. g., Hurtado v. California, 110 U. S. 516 (1884) (grand jury indictment requirement); Maxwell v. Dow, 176 U. S. 581 (1900) (12-person jury requirement); Twining v. New Jersey, 211 U. S. 78 (1908) (privilege against self-incrimination).
That changed with time. The Court came to conclude that certain Bill of Rights guarantees were sufficiently fundamental to fall within § l’s guarantee of “due process.” These included not only procedural protections listed in the first eight Amendments, see, e. g., Benton v. Maryland, 395 U. S. 784 (1969) (protection against double jeopardy), but substantive rights as well, see, e. g., Gitlow v. New York, 268 U. S. 652, 666 (1925) (right to free speech); Near v. Minnesota ex rel. Olson, 283 U. S. 697, 707 (1931) (same). In the process of incorporating these rights against the States, the Court often applied them differently against the States than against the Federal Government on the theory that only those “fundamental” aspects of the right required Due Process Clause protection. See, e. g., Betts v. Brady, 316 U. S. 455, 473 (1942) (holding that the Sixth Amendment required the appointment of counsel in all federal criminal cases in which the defendant was unable to retain an attorney, but that the Due Process Clause required appointment of counsel in state criminal cases only where “want of counsel . . . resulted] in a conviction lacking in ... fundamental fairness”). In more recent years, this Court has “abandoned the notion” that the guarantees in the Bill of Rights apply differently when incorporated against the States than they do when applied to the Federal Government. Ante, at 765 (opinion of the Court) (internal quotation marks omitted). But our cases continue to adhere to the view that a right is incorporated through the Due Process Clause only if it is sufficiently “fundamental,” ante, at 784-785, 789-791 (plurality opinion)— a term the Court has long struggled to define.
*811 While this Court has at times concluded that a right gains “fundamental” status only if it is essential to the American “scheme of ordered liberty” or “ ‘deeply rooted in this Nation’s history and tradition,’” ante, at 767 (opinion of the Court) (quoting Glucksberg, 521 U. S., at 721), the Court has just as often held that a right warrants Due Process Clause protection if it satisfies a far less measurable range of criteria, see Lawrence v. Texas, 539 U. S. 558, 562 (2003) (concluding that the Due Process Clause protects “liberty of the person both in its spatial and in its more transcendent dimensions”). Using the latter approach, the Court has determined that the Due Process Clause applies rights against the States that are not mentioned in the Constitution at all, even without seriously arguing that the Clause was originally understood to protect such rights. See, e. g., Lochner v. New York, 198 U. S. 45 (1905); Roe v. Wade, 410 U. S. 113 (1973); Lawrence, supra.
All of this is a legal fiction. The notion that a constitutional provision that guarantees only “process” before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words. Moreover, this fiction is a particularly dangerous one. The one theme that links the Court’s substantive due process precedents together is their lack of a guiding principle to distinguish “fundamental” rights that warrant protection from nonfundamental rights that do not. Today’s decision illustrates the point. Replaying a debate that has endured from the inception of the Court’s substantive due process jurisprudence, the dissents laud the “flexibility” in this Court’s substantive due process doctrine, post, at 871 (opinion of Stevens, J.); see post, at 918-919 (opinion of Breyer, J.), while the plurality makes yet another effort to impose principled restraints on its exercise, see ante, at 780-787. But neither side argues that the meaning they attribute to the Due Process Clause was consistent with public understanding at the time of its ratification.
*812 To be sure, the plurality’s effort to cabin the exercise of judicial discretion under the Due Process Clause by focusing its inquiry on those rights deeply rooted in American history and tradition invites less opportunity for abuse than the alternatives. See post, at 918 (Breyer, J., dissenting) (arguing that rights should be incorporated against the States through the Due Process Clause if they are “well suited to the carrying out of ... constitutional promises”); post, at 878 (Stevens, J., dissenting) (warning that there is no “all-purpose, top-down, totalizing theory of ‘liberty’ ” protected by the Due Process Clause). But any serious argument over the scope of the Due Process Clause must acknowledge that neither its text nor its history suggests that it protects the many substantive rights this Court’s cases now claim it does.
I cannot accept a theory of constitutional interpretation that rests on such tenuous footing. This Court’s substantive due process framework fails to account for both the text of the Fourteenth Amendment and the history that led to its adoption, filling that gap with a jurisprudence devoid of a guiding principle. I believe the original meaning of the Fourteenth Amendment offers a superior alternative, and that a return to that meaning would allow this Court to enforce the rights the Fourteenth Amendment is designed to protect with greater clarity and predictability than the substantive due process framework has so far managed.
I acknowledge the volume of precedents that have been built upon the substantive due process framework, and I further acknowledge the importance of stare decisis to the stability of our Nation’s legal system. But stare decisis is only an “adjunct” of our duty as judges to decide by our best lights what the Constitution means. Planned Parenthood of Southeastern Pa. v. Casey, 505 U. S. 833, 963 (1992) (Rehnquist, C. J., concurring in judgment in part and dissenting in part). It is not “an inexorable command.” Lawrence, supra, at 577. Moreover, as judges, we interpret the Con *813 stitution one case or controversy at a time. The question presented in this case is not whether our entire Fourteenth Amendment jurisprudence must be preserved or revised, but only whether, and to what extent, a particular Clause in the Constitution protects the particular right at issue here. With the inquiry appropriately narrowed, I believe this case presents an opportunity to reexamine, and begin the process of restoring, the meaning of the Fourteenth Amendment agreed upon by those who ratified it.
II
“It cannot be presumed that any clause in the constitution is intended to be without effect.” Marbury v. Madison, 1 Cranch 137, 174 (1803) (opinion for the Court by Marshall, C. J.). Because the Court’s Privileges or Immunities Clause precedents have presumed just that, I set them aside for the moment and begin with the text.
The Privileges or Immunities Clause of the Fourteenth Amendment declares that “[n]o State . . . shall abridge the privileges or immunities of citizens of the United States.” In interpreting this language, it is important to recall that constitutional provisions are “ 'written to be understood by the voters.’” Heller, 554 U. S., at 576 (quoting United States v. Sprague, 282 U. S. 716, 731 (1931)). Thus, the objective of this inquiry is to discern what “ordinary citizens” at the time of ratification would have understood the Privileges or Immunities Clause to mean. 554 U. S., at 577.
A
1
At the time of Reconstruction, the terms “privileges” and “immunities” had an established meaning as synonyms for “rights.” The two words, standing alone or paired together, were used interchangeably with the words “rights,” “liberties,” and “freedoms,” and had been since the time of Blackstone. See 1 W. Blackstone, Commentaries *129 (describing *814 the “rights and liberties” of Englishmen as “private immunities” and “civil privileges”). A number of antebellum judicial decisions used the terms in this manner. See, e. g., Magill v. Brown, 16 F. Cas. 408, 428 (No. 8,952) (CC ED Pa. 1833) (Baldwin, J.) (“The words 'privileges and immunities’ relate to the rights of persons, place or property; a privilege is a peculiar right, a private law, conceded to particular persons or places”). In addition, dictionary definitions confirm that the public shared this understanding. See, e. g., 2 N. Webster, An American Dictionary of the English Language 1039 (C. Goodrich & N. Porter rev. 1865) (defining “privilege” as “a right or immunity not enjoyed by others or by all” and listing among its synonyms the words “immunity,” “franchise,” “right,” and “liberty”); 1 id., at 661 (defining “immunity” as “[f]reedom from an obligation” or “particular privilege”); 2 id., at 1140 (defining “right” as “[pjrivilege or immunity granted by authority”).[2]
The fact that a particular interest was designated as a “privilege” or “immunity,” rather than a “right,” “liberty,” or “freedom,” revealed little about its substance. Blackstone, for example, used the terms “privileges” and “immunities” to describe both the inalienable rights of individuals and the positive-law rights of corporations. See 1 Commentaries, at *129 (describing “private immunities” as a “residuum of natural liberty,” and “civil privileges” as those “which society hath engaged to provide, in lieu of the natural liberties so given up by individuals”); id., at *468 (stating that a corporate charter enables a corporation to “establish *815 rules and orders” that serve as “the privileges and immunities ... of the corporation”). Writers in this country at the time of Reconstruction followed a similar practice. See, e. g., Racine & Mississippi R. Co. v. Farmers’ Loan & Trust Co., 49 Ill. 331, 334 (1868) (describing agreement between two railroad companies in which they agreed “‘to fully merge and consolidate the[ir] capital stock, powers, privileges, immunities and franchises’”); Hathorn v. Calef 53 Me. 471, 483-484 (1866) (concluding that a statute did not “modify any power, privileges, or immunity, pertaining to the franchise of any corporation”). The nature of a privilege or immunity thus varied depending on the person, group, or entity to whom those rights were assigned. See Lash, The Origins of the Privileges or Immunities Clause, Part I: “Privileges and Immunities” as an Antebellum Term of Art, 98 Geo. L. J. 1241, 1256-1257 (2010) (surveying antebellum usages of these terms).
2
The group of rights-bearers to whom the Privileges or Immunities Clause applies is, of course, “citizens.” By the time of Reconstruction, it had long been established that both the States and the Federal Government existed to preserve their citizens’ inalienable rights, and that these rights were considered “privileges” or “immunities” of citizenship.
This tradition begins with our country’s English roots. Parliament declared the basic liberties of English citizens in a series of documents ranging from the Magna Carta to the Petition of Right and the English Bill of Rights. See 1 B. Schwartz, The Bill of Rights: A Documentary History 8-16, 19-21, 41-46 (1971) (hereinafter Schwartz). These fundamental rights, according to the English tradition, belonged to all people but became legally enforceable only when recognized in legal texts, including acts of Parliament and the decisions of common-law judges. See B. Bailyn, The Ideological Origins of the American Revolution 77-79 (1967). These rights included many that later would be set forth in our *816 Federal Bill of Rights, such as the right to petition for redress of grievances, the right to a jury trial, and the right of “Protestants” to “have arms for their defence.” English Bill of Rights (1689), reprinted in 1 Schwartz 41, 43.
As English subjects, the colonists considered themselves to be vested with the same fundamental rights as other Englishmen. They consistently claimed the rights of English citizenship in their founding documents, repeatedly referring to these rights as “privileges” and “immunities.” For example, a Maryland law provided:
“[A]ll the Inhabitants of this Province being Christians (Slaves excepted) Shall have and enjoy all such rights liberties immunities priviledges and free customs within this Province as any naturall born subject of England hath or ought to have or enjoy in the Realm of England .. . .” Md. Act for the Liberties of the People (1639), in id., at 68 (emphasis added).[3]
*817 As tensions between England and the Colonies increased, the colonists adopted protest resolutions reasserting their claim to the inalienable rights of Englishmen. Again, they used the terms “privileges” and “immunities” to describe these rights. As the Massachusetts Resolves declared:
“Resolved, That there are certain essential Rights of the British Constitution of Government, which are founded in the Law of God and Nature, and are the common Rights of Mankind — Therefore
“Resolved, That no Man can justly take the Property of another without his Consent: And that upon this original Principle the Right of Representation ... is evidently founded.
“Resolved, That this inherent Right, together with all other, essential Rights, Liberties, Privileges and Immunities of the People of Great Britain, have been fully confirmed to them by Magna Charta.” The Massachusetts Resolves (Oct. 29, 1765), reprinted in Prologue to Revolution: Sources and Documents on the Stamp Act Crisis, 1764-1766, p. 56 (E. Morgan ed. 1959) (some emphasis added).[4]
*818 In keeping with this practice, the First Continental Congress declared in 1774 that the King had wrongfully denied the colonists “the rights, liberties, and immunities of free and natural-born subjects . . . within the realm of England.” 1 Journals of the Continental Congress 1774-1789, p. 68 (W. Ford ed. 1904). In an address delivered to the inhabitants of Quebec that same year, the Congress described those rights as including the “great” “right[s]” of “trial by jury,” “Habeas Corpus,” and “freedom of the press.” Address of the Continental Congress to the Inhabitants of Quebec (1774), reprinted in 1 Schwartz 221-223.
After declaring their independence, the newly formed States replaced their colonial charters with constitutions and state bills of rights, almost all of which guaranteed the same fundamental rights that the former colonists previously had claimed by virtue of their English heritage. See, e. g., Pa. Declaration of Rights (1776), reprinted in 5 Thorpe 3081-3084 (declaring that “all men are born equally free and independent, and have certain natural, inherent and inalienable rights,” including the “right to worship Almighty God according to the dictates of their own consciences” and the “right to bear arms for the defence of themselves and the state”).[5]
Several years later, the Founders amended the Constitution to expressly protect many of the same fundamental rights against interference by the Federal Government. Consistent with their English heritage, the founding generation generálly did not consider many of the rights identified in these amendments as new entitlements, but as inalienable rights of all men, given legal effect by their codification in the Constitution’s text. See, e. g., 1 Annals of Cong. 431-432, 436-437, 440-442 (1789) (statement of Rep. Madison) *819 (proposing Bill of Rights in the First Congress); The Federalist No. 84, pp. 531-533 (B. Wright ed. 1961) (A. Hamilton); see also Heller, 554 U. S., at 592 (“[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right”). The Court’s subsequent decision in Barron, however, made plain that the codification of these rights in the Bill of Rights made them legally enforceable only against the Federal Government, not the States. See 7 Pet., at 247.
3
Even though the Bill of Rights did not apply to the States, other provisions of the Constitution did limit state interference with individual rights. Article IV, §2, cl. 1, provides that “[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.” The text of this provision resembles the Privileges or Immunities Clause, and it can be assumed that the public’s understanding of the latter was informed by its understanding of the former.
Article IV, § 2, was derived from a similar clafise in the Articles of Confederation, and reflects the dual citizenship the Constitution provided to all Americans after replacing that “league” of separate sovereign States. Gibbons v. Ogden, 9 Wheat. 1, 187 (1824); see 3 J. Story, Commentaries on the Constitution of the United States § 1800, p. 675 (1833). By virtue of a person’s citizenship in a particular State, he was guaranteed whatever rights and liberties that State’s constitution and laws made available. Article IV, § 2, vested citizens of each State with an additional right: the assurance that they would be afforded the “privileges and immunities” of citizenship in any of the several States in the Union to which they might travel.
What were the “Privileges and Immunities of Citizens in the several States”? That question was answered perhaps most famously by Justice Bushrod Washington sitting as Cir *820 cuit Justice in Corfield v. Coryell, 6 F. Cas. 546, 551-552 (No. 3,230) (CC ED Pa. 1825). In that case, a Pennsylvania citizen claimed that a New Jersey law prohibiting nonresidents from harvesting oysters from the State’s waters violated Article IV, § 2, because it deprived him, as an out-of-state citizen, of a right New Jersey availed to its own citizens. Id., at 550. Justice Washington rejected that argument, refusing to “accede to the proposition” that Article IV, § 2, entitled “citizens of the several states ... to participate in all the rights which belong exclusively to the citizens of any other particular state.” Id., at 552 (emphasis added). In his view, Article IV, §2, did not guarantee equal access to all public benefits a State might choose to make available to its citizens. See id., at 552. Instead, it applied only to those rights “which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments.” Id., at 551 (emphasis added). Other courts generally agreed with this principle. See, e. g., Abbot v. Bayley, 23 Mass. 89, 92-93 (1827) (noting that the “privileges and immunities” of citizens in the several States protected by Article IV, §2, are “qualified and not absolute” because they do not grant a traveling citizen the right of “suffrage or of eligibility to office” in the State to which he travels).
When describing those “fundamental” rights, Justice Washington thought it “would perhaps be more tedious than difficult to enumerate” them all, but suggested that they could “be all comprehended under” a broad list of “general heads,” such as “[p]rotection by the government,” “the enjoyment of life and liberty, with the right to acquire and possess property of every kind,” “the benefit of the writ of habeas corpus,” and the right of access to “the courts of the state,” among others.[6] Corfield, supra, at 551-552.
*821 Notably, Justice Washington did not indicate whether Article IV, § 2, required States to recognize these fundamental rights in their own citizens and thus in sojourning citizens alike, or whether the Clause simply prohibited the States from discriminating against sojourning citizens with respect to whatever fundamental rights state law happened to recognize. On this question, the weight of legal authorities at the time of Reconstruction indicated that Article IV, § 2, prohibited States from discriminating against sojourning citizens when recognizing fundamental rights, but did not require States to recognize those rights and did not prescribe their content. The highest courts of several States adopted this view, see, e. g., Livingston v. Van Ingen, 9 Johns. *507, *561 (N. Y. Sup. Ct. 1812) (Yates, J.); id., at *577 (Kent, C. J.); Campbell v. Morris, 3 H. & McH. 535, 553-554 (Md. Gen. Ct. 1797) (Chase, J.), as did several influential treatise writers, see T. Cooley, Constitutional Limitations 15-16, and n. 3 (1868) (describing Article IV, § 2, as designed “to prevent discrimination by the several States against the citizens and public proceedings of other States”); 2 J. Kent, Commentaries on American Law 35 (11th ed. 1867) (stating that Article IV, §2, entitles sojourning citizens “to the privileges that persons of the same description are entitled to in the state to which the removal is made, and to none other”). This Court adopted the same conclusion in a unanimous opinion *822 just one year after the Fourteenth Amendment was ratified. See Paul v. Virginia, 8 Wall. 168, 180 (1869).
* * *
The text examined so far demonstrates three points about the meaning of the Privileges or Immunities Clause in § 1. First, “privileges” and “immunities” were synonyms for “rights.” Second, both the States and the Federal Government had long recognized the inalienable rights of their citizens. Third, Article IV, §2, of the Constitution protected traveling citizens against- state discrimination with respect to the fundamental rights of state citizenship.
Two questions still remain, both provoked by the textual similarity between § l’s Privileges or Immunities Clause and Article IV, § 2. The first involves the nature of the rights at stake: Are the privileges or immunities of “citizens of the United States” recognized by § 1 the same as the privileges and immunities of “Citizens in the several States” to which Article IV, § 2, refers? The second involves the restriction imposed on the States: Does § 1, like Article IV, § 2, prohibit only discrimination with respect to certain rights if the State chooses to recognize them, or does it require States to recognize those rights? I address each question in turn.
B
I start with the nature of the rights that § l’s Privileges or Immunities Clause protects. Section 1 overruled Dred Scott’s holding that blacks were not citizens of either the United States or their own State and, thus, did not enjoy “the privileges and immunities of citizens” embodied in the Constitution. 19 How., at 417. The Court in Dred Scott did not distinguish between privileges and immunities of citizens of the United States and citizens in the several States, instead referring to the rights of citizens generally. It did, however, give examples of what the rights of citizens were— *823 the constitutionally enumerated rights of “the full liberty of speech” and the right “to keep and carry arms.” Ibid.
Section 1 protects the rights of citizens “of the United States” specifically. The evidence overwhehningly demonstrates that the privileges and immunities of such citizens included individual rights enumerated in the Constitution, including the right to keep and bear arms.
1
Nineteenth-century treaties through which the United States acquired territory from other sovereigns routinely promised inhabitants of the newly acquired Territories that they would enjoy all of the “rights,” “privileges,” and “immunities” of United States citizens. See, e. g., Treaty of Amity, Settlement, and Limits, Art. 6, Feb. 22, 1819, 8 Stat. 256-258, T. S. No. 327 (entered into force Feb. 19, 1821) (cession of Florida) (“The inhabitants of the territories which his Catholic Majesty cedes to the United States, by this Treaty, shall be incorporated in the Union of the United States, as soon as may be consistent with the principles of the Federal Constitution, and admitted to the enjoyment of all the privileges, rights, and immunities, of the citizens of the United States” (emphasis added)).[7]
*824 Commentators of the time explained that the rights and immunities of “citizens of the United States” recognized in these treaties “undoubtedly mean[t] those privileges that are common to all the citizens of this republic.” Marcus, An Examination of the Expediency and Constitutionality of Prohibiting Slavery in the State of Missouri 17 (1819). It is therefore altogether unsurprising that several of these treaties identify liberties enumerated in the Constitution as privileges and immunities common to all United States citizens.
For example, the Louisiana Cession Act of 1803, which codified a treaty between the United States and France culminating in the Louisiana Purchase, provided:
“The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States; and in the mean time they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion which they profess.” Treaty Between the United States of America and the French Republic, Art. III, Apr. 30, 1803, 8 Stat. 2002, T. S. No. 86 (emphasis added).[8]
*825 The Louisiana Cession Act reveals even more about the privileges and immunities of United States citizenship because it provoked an extensive public debate on the meaning of that term. In 1820, when the Missouri Territory (which the United States acquired through the Cession Act) sought to enter the Union as a new State, a debate ensued over whether to prohibit slavery within Missouri as a condition of its admission. Some Congressmen argued that prohibiting slavery in Missouri would deprive its inhabitants of the “privileges and immunities” they had been promised by the Cession Act. See, e. g., 35 Annals of Cong. 1083 (1820) (remarks of Kentucky Rep. Hardin). But those who opposed slavery in Missouri argued that the right to hold slaves was merely a matter of state property law, not one of the privileges and immunities of United States citizenship guaranteed by the Act.[9]
Daniel Webster was among the leading proponents of the antislavery position. In his “Memorial to Congress,” Webster argued that “[t]he rights, advantages and immunities here spoken of [in the Cession Act] must ... be such as are recognized or communicated by the Constitution of the United States,” not the “rights, advantages and immunities, derived exclusively from the State governments . . . .” *826 D. Webster, A Memorial to the Congress of the United States, on the Subject of Restraining the Increase of Slavery in New States To Be Admitted Into the Union 15 (Dec. 15, 1819) (emphasis added). “The obvious meaning” of the Act, in Webster’s view, was that “the rights derived under the federal Constitution shall be enjoyed by the inhabitants of [the Territory].” Id., at 15-16 (emphasis added). In other words, Webster articulated a distinction between the rights of United States citizenship and the rights of state citizenship, and argued that the former included those rights “recognized or communicated by the Constitution.” Since the right to hold slaves was not mentioned in the Constitution, it was not a right of federal citizenship.
Webster and his allies ultimately lost the debate over slavery in Missouri, and the Territory was admitted as a slave State as part of the now-famous Missouri Compromise. Missouri Enabling Act of Mar. 6, 1820, ch. 22, § 8, 3 Stat. 548. But their arguments continued to inform public understanding of the privileges and immunities of United States citizenship. In 1854, Webster’s Memorial was republished in a pamphlet discussing the Nation’s next major debate on slavery — the proposed repeal of the Missouri Compromise through the Kansas-Nebraska Act, see The Nebraska Question: Comprising Speeches in the United States Senate: Together With the History of the Missouri Compromise 9-12 (1854). It was published again in 1857 in a collection of famous American speeches. See Political Text-Book, or Encyclopedia: Containing Everything Necessary for the Reference of the Politicians and Statesmen of the United States 601-604 (M. Cluskey ed. 1857); see also Lash, 98 Geo. L. J., at 1294-1296 (describing Webster’s arguments and their influence).
2
Evidence from the political branches in the years leading to the Fourteenth Amendment’s adoption demonstrates broad public understanding that the privileges and immuni *827 ties of United States citizenship included rights set forth in the Constitution, just as Webster and his allies had argued. In 1868, President Andrew Johnson issued a proclamation granting amnesty to former Confederates, guaranteeing “to all and to every person who directly or indirectly participated in the late insurrection or rebellion, a full pardon and amnesty for the offence of treason ... with restoration of all rights, privileges, and immunities under the Constitution and the laws which have been made in pursuance thereof.” 15 Stat. 712 (emphasis added).
Records from the 39th Congress further support this understanding.
a
After the Civil War, Congress established the Joint Committee on Reconstruction to investigate circumstances in the Southern States and to determine whether, and on what conditions, those States should be readmitted to the Union. See Cong. Globe, 39th Cong., 1st Sess., 6, 30 (1865) (hereinafter 39th Cong. Globe); M. Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights 57 (1986) (hereinafter Curtis). That Committee would ultimately recommend the adoption of the Fourteenth Amendment, justifying its recommendation by submitting a report to Congress that extensively catalogued the abuses of civil rights in the former slave States and argued that “adequate security for future peace and safety ... can only be found in such changes of the organic law as shall determine the civil rights and privileges of all citizens in all parts of the republic.” See Report of the Joint Committee on Reconstruction, S. Rep. No. 112, 39th Cong., 1st Sess., 15 (1866); H. R. Rep. No. 30, 39th Cong., 1st Sess., p. XXI (1866).
As the Court notes, the Committee’s Report “was widely reprinted in the press and distributed by Members of the 39th Congress to their constituents.” Ante, at 772; B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 264-265 (1914) (noting that 150,000 copies of the *828 Report were printed and that it was widely distributed as a campaign document in the election of 1866). In addition, newspaper coverage suggests that the wider public was aware of the Committee’s work even before the Report was issued. For example, the Fort Wayne Daily Democrat (which appears to have been unsupportive of the Committee’s work) paraphrased a motion instructing the Committee to
“enquire into [the] expediency of amending the Constitution of the United States so as to declare with greater certainty the power of Congress to enforce and determine by appropriate legislation all the guarantees contained in that instrument.” The Nigger Congress! Fort Wayne Daily Democrat, Feb. 1, 1866, p. 4 (emphasis added).
b
Statements made by Members of Congress leading up to, and during, the debates on the Fourteenth Amendment point in the same direction. The record of these debates has been combed before. See Adamson v. California, 332 U. S. 46, 92-110 (1947) (appendix to dissenting opinion of Black, J.) (concluding that the debates support the conclusion that § 1 was understood to incorporate the Bill of Rights against the States); ante, at 762, n. 9, 774, n. 23, (opinion of the Court) (counting the debates among other evidence that § 1 applies the Second Amendment against the States). Before considering that record here, it is important to clarify its relevance. When interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision at the time it was adopted. Statements by legislators can assist in this process to the extent they demonstrate the manner in which the public used or understood a particular word or phrase. They can further assist to the extent there is evidence that these statements were disseminated to the public. In other words, this evidence is useful not because *829 it demonstrates what the draftsmen of the text may have been thinking, but only insofar as it illuminates what the public understood the words chosen by the draftsmen to mean.
(1)
Three speeches stand out as particularly significant. Representative John Bingham, the principal draftsman of § 1, delivered a speech on the floor of the House in February 1866 introducing his first draft of the provision. Bingham began by discussing Barron and its holding that the Bill of Rights did not apply to the States. He then argued that a constitutional amendment was necessary to provide “an express grant of power in Congress to enforce by penal enactment these great canons of the supreme law, securing to all the citizens in every State all the privileges and immunities of citizens, and to all the people all the sacred rights of person.” 39th Cong. Globe 1089-1090 (1866). Bingham emphasized that § 1 was designed “to arm the Congress of the United States, by the consent of the people of the United States, with the power to enforce the bill of rights as it stands in the Constitution today. It ‘hath that extent — no more.’” Id., at 1088.
Bingham’s speech was printed in pamphlet form and broadly distributed in 1866 under the title, “One Country, One Constitution, and One People,” and the subtitle, “In Support of the Proposed Amendment to Enforce the Bill of Rights.”[10] Newspapers also reported his proposal, with the New York Times providing particularly extensive coverage, *830 including a full reproduction of Bingham’s first draft of § 1 and his remarks that a constitutional amendment to “enforc[e]” the “immortal bill of rights” was “absolutely essential to American nationality.” N. Y. Times, Feb. 27, 1866, p. 8.
Bingham’s first draft of § 1 was different from the version ultimately adopted. Of particular importance, the first draft granted Congress the “power to make all laws ... necessary and proper to secure” the “citizens of each State all privileges and immunities of citizens in the several States,” rather than restricting state power to “abridge” the privileges or immunities of citizens of the United States.[11] 39th Cong. Globe 1088.
That draft was met with objections, which the Times covered extensively. A front-page article hailed the “Clear and Forcible Speech” by Representative Robert Hale against the draft, explaining — and endorsing — Hale’s view that Bingham’s proposal would “confer upon Congress all the rights and power of legislation now reserved to the States” and would “in effect utterly obliterate State rights and State authority over their own internal affairs.”[12] N. Y. Times, Feb. 28, 1866, p. 1.
*831 Critically, Hale did not object to the draft insofar as it purported to protect constitutional liberties against state interference. Indeed, Hale stated that he believed (incorrectly in light of Barron) that individual rights enumerated in the Constitution were already enforceable against the States. See 39th Cong. Globe 1064 (“I have, somehow or other, gone along with the impression that there is that sort of protection thrown over us in some way, whether with or without the sanction of a judicial decision that we are so protected”); see N. Y. Times, Feb. 28,1866, at 1. Hale’s misperception was not uncommon among members of the Reconstruction generation. See infra, at 842-843. But that is secondary to the point that the Times’ coverage of this debate over § l’s meaning suggests public awareness of its main contours — i. e., that § 1 would, at a minimum, enforce constitutionally enumerated rights of United States citizens against the States.
Bingham’s draft was tabled for several months. In the interim, he delivered a second well-publicized speech, again arguing that a constitutional amendment was required to give Congress the power to enforce the Bill of Rights against the States. That speech was printed in pamphlet form, see Speech of Hon. John A. Bingham, of Ohio, on the Civil Rights Bill, Mar. 9, 1866 (Cong. Globe); see 39th Cong. Globe 1837 (remarks of Rep. Lawrence) (noting that the speech was “extensively published”), and the New York Times covered the speech on its front page. Thirty-Ninth Congress, N. Y. Times, Mar. 10, 1866, p. 1.
By the time the debates on the Fourteenth Amendment resumed, Bingham had amended his draft of § 1 to include the text of the Privileges or Immunities Clause that was ultimately adopted. Senator Jacob Howard introduced the new draft on the floor of the Senate in the third speech relevant here. Howard explained that the Constitution recognized “a mass of privileges, immunities, and rights, some of them secured by the second section of the fourth article of the *832 Constitution, . . . some by the first eight amendments of the Constitution,” and that “there is no power given in the Constitution to enforce and to carry out any of these guarantees” against the States. 39th Cong. Globe 2765. Howard then stated that “[t]he great object”- of §1 was to “restrain the power of the States and compel them at all times to respect these great fundamental guarantees.” Id., at 2766. Section 1, he indicated, imposed “a general prohibition upon all the States, as such, from abridging the privileges and immunities of the citizens of the United States.” Id., at 2765.
In describing these rights, Howard explained that they included “the privileges' and immunities spoken of” in Article IV, §2. Id., at 2765. Although he did not catalogue the precise “nature” or “extent” of those rights, he thought “Cor-field vs. Coryell” provided a useful description. Howard then submitted that
“[t]o these privileges and immunities, whatever they may be— ... should be added the personal rights guarantied and secured by the first eight amendments of the Constitution; such as the freedom of speech and of the press; the. right of the people peaceably to assemble and petition the Government for a redress of grievances, [and] . . . the right to keep and to bear arms.” Ibid. (emphasis added).
News of Howard’s speech was carried in major newspapers across the country, including the New York Herald, see N. Y. Herald, May 24, 1866, p. 1, which was the best selling paper in the Nation at that time, see A. Amar, The Bill of Rights: Creation and Reconstruction 187 (1998) (hereinafter Amar).[13] The New York Times carried the speech as well, *833 reprinting a lengthy excerpt of Howard’s remarks, including the statements quoted above. N. Y. Times, May 24, 1866, p. 1. The following day’s Times editorialized on Howard’s speech, predicting that “[t]o this, the first section of the amendment, the Union party throughout the country will yield a ready acquiescence, and the South could offer no justifiable resistance,” suggesting that Bingham’s narrower second draft had not been met with the same objections that Hale had raised against the first. N. Y. Times, May 25, 1866, p. 4.
As a whole, these well-circulated speeches indicate that § 1 was understood to enforce constitutionally declared rights against the States, and they provide no suggestion that any language in the section other than the Privileges or Immunities Clause would accomplish that task.
(2)
When read against this backdrop, the civil rights legislation adopted by the 39th Congress in 1866 further supports this view. Between passing the Thirteenth Amendment— which outlawed slavery alone — and the Fourteenth Amendment, Congress passed two significant pieces of legislation. The first was the Civil Rights Act of 1866, which provided that “all persons born in the United States” were “citizens of the United States” and that “such citizens, of every race and color, . . . shall have the same right” to, among other things, “full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens.” § 1, 14 Stat. 27.
Both proponents and opponents of this Act described it as providing the “privileges” of citizenship to freedmen, and defined those privileges to include constitutional rights, such as the right to keep and bear arms. See 39th Cong. Globe 474 (remarks of Sen. Trumbull) (stating that “the late slave- *834 holding States” had enacted laws “depriving persons of African descent of privileges which are essential to freemen,” including “prohibit[ing] any negro or mulatto from having fire-arms” and stating that “[t]he purpose of the bill under consideration is to destroy all these discriminations”); id., at 1266-1267 (remarks of Rep. Raymond) (opposing the Act, but recognizing that to “[m ake the colored man a citizen of the United States” would guarantee to him, inter alia, “a defined status ... a right to defend himself and his wife and children; a right to bear arms”).
Three months later, Congress passed the Freedmen’s Bureau Act, which also entitled all citizens to the “full and equal benefit of all laws and proceedings concerning personal liberty” and “personal security.” Act of July 16, 1866, § 14,14 Stat. 176. The Act stated expressly that the rights of personal liberty and security protected by the Act “included] the constitutional right to bear arms.” Ibid.
(3)
There is much else in the legislative record. Many statements by Members of Congress corroborate the view that the Privileges or Immunities Clause enforced constitutionally enumerated rights against the States. See Curtis 112 (collecting examples). I am not aware of any statement that directly refutes that proposition. That said, the record of the debates — like most legislative history — is less than crystal clear. In particular, much ambiguity derives from the fact that at least several Members described § 1 as protecting the privileges and immunities of citizens “in the several States,” harkening back to Article IV, §2. See supra, at 832-833 (describing Sen. Howard’s speech). These statements can be read to support the view that the Privileges or Immunities Clause protects some or all the fundamental rights of “citizens” described in Gorfield. They can also be read to support the view that the Privileges or Immunities Clause, like Article IV, § 2, prohibits only state discrimination with *835 respect to those rights it covers, but does not deprive States of the power to deny those fights to all citizens equally.
I examine the rest of the historical record with this understanding. But for purposes of discerning what the public most likely thought the Privileges or Immunities Clause to mean, it is significant that the most widely publicized statements by the legislators who voted on § 1 — Bingham, Howard, and even Hale — point unambiguously toward the conclusion that the Privileges or Immunities Clause enforces at least those fundamental rights enumerated in the Constitution against the States, including the Second Amendment right to keep and bear arms.
3
Interpretations of the Fourteenth Amendment in the period immediately following its ratification help to establish the public understanding of the text at the time of its adoption.
Some of these interpretations come from Members of Congress. During an 1871 debate on a bill to enforce the Fourteenth Amendment, Representative Henry Dawes listed the Constitution’s first eight Amendments, including “the right to keep and bear arms,” before explaining that after the Civil War, the country “gave the most grand of all these rights, privileges, and immunities, by one single amendment to the Constitution, to four millions of American citizens” who formerly were slaves. Cong. Globe, 42d Cong., 1st Sess., 475-476 (1871). “It is all these,” Dawes explained, “which are comprehended in the words 'American citizen.’” Id., at 476; see also id., at 334 (remarks of Rep. Hoar) (stating that the Privileges or Immunities Clause referred to those rights “declared to belong to the citizen by the Constitution itself”). Even opponents of Fourteenth Amendment enforcement legislation acknowledged that the Privileges or Immunities Clause protected constitutionally enumerated individual rights. See 2 Cong. Rec. 384-385 (1874) (remarks *836 of Rep. Mills) (opposing enforcement law, but acknowledging, in referring to the Bill of Rights, that “[t]hese first amendments and some provisions of the Constitution of like import embrace the ‘privileges and immunities’ of citizenship as set forth in article 4, section 2, of the Constitution and in the fourteenth amendment” (emphasis added)); see Curtis 166-170 (collecting examples).
Legislation passed in furtherance of the Fourteenth Amendment demonstrates, even more clearly this understanding. For example, Congress enacted the Civil Rights Act of 1871, 17 Stat. 13, which was titled in pertinent part “An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States,” and which is codified in the still-existing 42 U. S. C. § 1983. That statute prohibits state officials from depriving citizens of “any rights, privileges, or immunities secured by the Constitution.” Rev. Stat. 1979, 42 U. S. C. §1983 (emphasis added). Although the Judiciary ignored this provision for decades after its enactment, this Court has come to interpret the statute, unremarkably in light of its text, as protecting constitutionally enumerated rights. Monroe v. Pape, 365 U. S. 167, 171 (1961).
A Federal Court of Appeals decision written by a future Justice of this Court adopted the same understanding of the Privileges or Immunities Clause. See, e. g., United States v. Hall, 26 F. Cas. 79, 82 (No. 15,282) (CC SD Ala. 1871) (Woods, J.) (“We think, therefore, that the . . . rights enumerated in the first eight articles of amendment to the constitution of the United States, are the privileges and immunities of citizens of the United States”). In addition, two of the era’s major constitutional treatises reflected the understanding that §1 would protect constitutionally enumerated rights from state abridgment.[14] A third such treatise unambigu *837 ously indicates that the Privileges or Immunities Clause accomplished this task. G. Paschal, The Constitution of the United States 290 (1868) (explaining that the rights listed in § 1 had “already been guarantied” by Article IV and the Bill of Rights, but that “[t]he new feature declared” by § 1 was that these rights, “which had been construed to apply only to the national government, are thus imposed upon the States”).
Another example of public understanding comes from United States Attorney Daniel Corbin’s statement in an 1871 Ku Klux Klan prosecution. Corbin cited Barron and declared:
“[T]he fourteenth amendment changes all that theory, and lays the same restriction upon the States that before lay upon the Congress of the United States — that, as Congress heretofore could not interfere with the right of the citizen to keep and bear arms, now, after the adoption of the fourteenth amendment, the State cannot interfere with the right of the citizen to keep and bear arms. The right to keep and bear arms is included in the fourteenth amendment, under 'privileges and immunities.’” Proceedings in the Ku Klux Trials at Columbia, S. C., in the United States Circuit Court, November Term, 1871, p. 147 (1872).
* *
This evidence plainly shows that the ratifying public understood the Privileges or Immunities Clause to protect constitutionally enumerated rights, including the right to keep *838 and bear arms. As the Court demonstrates, there can be no doubt that § 1 was understood to enforce the Second Amendment against the States. See ante, at 770-780. In my view, this is because the right to keep and bear arms was understood to be a privilege of American citizenship guaranteed by the Privileges or Immunities Clause.
C
The next question is whether the Privileges or Immunities Clause merely prohibits States from discriminating among citizens if they recognize the Second Amendment’s right to keep and bear arms, or whether the Clause requires States to recognize the right. The municipal respondents, Chicago and Oak Park, argue for the former interpretation. They contend that the Second Amendment, as applied to the States through the Fourteenth, authorizes a State to impose an outright ban on handgun possession such as the ones at issue here so long as a State applies it to all citizens equally.[15] The Court explains why this antidiscrimination-only reading of § 1 as a whole is “implausible.” Ante, at 778 (citing Brief for Municipal Respondents 64). I agree, but because I think it is the Privileges or Immunities Clause that applies this right to the States, I must explain why this Clause in particular protects against more than just state discrimination, and in fact establishes a minimum baseline of rights for all American citizens.
*839 1
I begin, again, with the text. The Privileges or Immunities Clause opens with the command that “No State shall” abridge the privileges or immunities of citizens of the United States. Arndt. 14, §1 (emphasis added). The very same phrase opens Article I, § 10, of the Constitution, which prohibits the States from “passing] any Bill of Attainder” or “ex post facto Law,” among other things. Article I, §10, is one of the few constitutional provisions that limits state authority. In Barron, when Chief Justice Marshall interpreted the Bill of Rights as lacking “plain and intelligible language” restricting state power to infringe upon individual liberties, he pointed to Article I, § 10, as an example of text that would have accomplished that task. 7 Pet., at 250. Indeed, Chief Justice Marshall would later describe Article I, § 10, as “a bill of rights for the people of each state.” Fletcher v. Peck, 6 Cranch 87, 138 (1810). Thus, the fact that the Privileges or Immunities Clause uses the command “[n]o State shall” — which Article IV, §2, does not — strongly suggests that the former imposes a greater restriction on state power than the latter.
This interpretation is strengthened when one considers that the Privileges or Immunities Clause uses the verb “abridge,” rather than “discriminate,” to describe the limit it imposes on state authority. The Webster’s dictionary in use at the time of Reconstruction defines the word “abridge” to mean “[t]o deprive; to cut off;... as, to abridge one of his rights.” 1 Webster, An American Dictionary of the English Language, at 6. The Clause is thus best understood to impose a limitation on state power to infringe upon pre-existing substantive rights. It raises no indication that the Framers of the Clause used the word “abridge” to prohibit only discrimination.
This most natural textual reading is underscored by a well-publicized revision to the Fourteenth Amendment that the Reconstruction Congress rejected. After several *840 Southern States refused to ratify the Amendment, President Johnson met with their Governors to draft a compromise. N. Y. Times, Feb. 5, 1867, p. 5. Their proposal eliminated Congress' power to enforce the Amendment (granted in § 5), and replaced the Privileges or Immunities Clause in § 1 with the following:
“All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the States in which they reside, and the Citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States.” Draft reprinted in 1 Documentary History of Reconstruction 240 (W. Fleming ed. 1950) (hereinafter Fleming) (emphasis added).
Significantly, this proposal removed the “[n]o State shall” directive and the verb “abridge” from § 1, and also changed the class of rights to be protected from those belonging to “citizens of the United States” to those of the “citizens in the several States.” This phrasing is materially indistinguishable from Article IV,'§2, which generally was understood as an antidiscrimination provision alone. See supra, at 819-822. The proposal thus strongly indicates that at least the President of the United States and several Southern Governors thought that the Privileges or Immunities Clause, which they unsuccessfully tried to revise, prohibited more than just state-sponsored discrimination.
2
The argument that the Privileges or Immunities Clause prohibits no more than discrimination often is followed by a claim that public discussion of the Clause, and of § 1 generally, was not extensive. Because of this, the argument goes, § 1 must not have been understood to accomplish such a significant task as subjecting States to federal enforcement of a minimum baseline of rights. That argument overlooks *841 critical aspects of the Nation’s history that underscored the need for, and wide agreement upon, federal enforcement of constitutionally enumerated rights against the States, including the right to keep and bear arms.
a
I turn first to public debate at the time of ratification. It is true that the congressional debates over §1 were relatively brief. It is also true that there is little evidence of extensive debate in the States. Many state legislatures did not keep records of their debates, and the few records that do exist reveal only modest discussion. See Curtis 145. These facts are not surprising.
First, however consequential we consider the question today, the nationalization of constitutional rights was not the most controversial aspect of the Fourteenth Amendment at the time of its ratification. The Nation had just endured a tumultuous civil war, and §§ 2, 3, and 4 — which reduced the representation of States that denied voting rights to blacks, deprived most former Confederate officers of the power to hold elective office, and required States to disavow Confederate war debts — were far more polarizing and' consumed far more political attention. See Wildenthal 1600; Hardy, Original Popular Understanding of the Fourteenth Amendment as Reflected in the Print Media of 1866-1868, 30 Whittier L. Rev. 695, 699 (2009). '
Second, the congressional debates on the Fourteenth Amendment reveal that many Representatives, and probably many citizens, believed that the Thirteenth Amendment, the 1866 Civil Rights legislation, or some combination of the two, had already enforced constitutional rights against the States. Justice Black’s dissent in Adamson chronicles this point in detail. 332 U. S., at 107-108 (appendix to dissenting opinion). Regardless of whether that understanding was accurate as a matter of constitutional law, it helps to explain why *842 Congressmen had little to say during the debates about § 1. See ibid.
Third, while Barron made plain that the Bill of Rights was not legally enforceable against the States, see supra, at 806-807, the significance of that holding should not be overstated. Like the Framers, see supra, at 818-819, many 19th-century Americans understood the Bill of Rights to declare inalienable rights that pre-existed all government. Thus, even though the Bill of Rights technically applied only to the Federal Government, many believed that it declared rights that no legitimate government could abridge.
Chief Justice Henry Lumpkin's decision for the Georgia Supreme Court in Nunn v. State, 1 Ga. 243 (1846), illustrates this view. In assessing state power to regulate firearm possession, Lumpkin wrote that he was “aware that it has been decided, that [the Second Amendment], like other amendments adopted at the same time, is a restriction upon the government of the United States, and does not extend to the individual States.” Id., at 250. But he still considered the right to keep and bear arms as “an unalienable right, which lies at the bottom of every free government,” and thus found the States bound to honor it. Ibid. Other state courts adopted similar positions with respect to the right to keep and bear arms and other enumerated rights.[16] Some courts even suggested that the protections in the Bill of Rights were legally enforceable against the States, Barron notwithstanding.[17] A prominent treatise of the era took the same position. W. Rawle, A View of the Constitution of the *843 United States of America 124-125 (2d ed. 1829) (arguing that certain of the first eight Amendments “appl[y] to the state legislatures” because those Amendments “form parts of the declared rights of the people, of which neither the state powers nor those of the Union can ever deprive them”); id,., at 125-126 (describing the Second Amendment “right of the people to keep and bear Arms” as “a restraint on both” Congress and the States); see also Heller, 554 U. S., at 607 (describing Rawle’s treatise as “influential”). Certain abolitionist leaders adhered to this view as well. Lysander Spooner championed the popular abolitionist argument that slavery was inconsistent with constitutional principles, citing as evidence the fact that it deprived black Americans of the “natural right of all men ‘to keep and bear arms’ for their personal defence,” which he believed the Constitution “prohibit[ed] both Congress and the State governments from infringing.” The Unconstitutionality of Slavery 98 (1860).
In sum, some appear to have believed that the Bill of Rights did apply to the States, even though this Court had squarely rejected that theory. See, e. g., supra, at 830-831 (recounting Rep. Hale’s argument to this effect). Many others believed that the liberties codified in the Bill of Rights were ones that no State should abridge, even though they understood that the Bill technically did not apply to States. These beliefs, combined with the fact that most state constitutions recognized many, if not all, of the individual rights enumerated in the Bill of Rights, made the need for federal enforcement of constitutional liberties against the States an afterthought. See ante, at 777 (opinion of the Court) (noting that, “[i]n 1868, 22 of the 37 States in the Union had state constitutional provisions explicitly protecting the right to keep and bear arms”). That changed with the national conflict over slavery.
b
In the contentious years leading up to the Civil War, those who sought to retain the institution of slavery found that to *844 do so, it was necessary to eliminate more and more of the basic liberties of slaves, free blacks, and white abolitionists. Congressman Tobias Plants explained that slaveholders “could not hold [slaves] safely where dissent was permitted,” so they decided that “all dissent must be suppressed by the strong hand of power.” 39th Cong. Globe 1013. The measures they used were ruthless, repressed virtually every right recognized in the Constitution, and demonstrated that preventing only discriminatory state firearms restrictions would have been a hollow assurance for liberty. Public reaction indicates that the American people understood this point.
The overarching goal of proslavery forces was to repress the spread of abolitionist thought and the concomitant risk of a slave rebellion. Indeed, it is difficult to overstate the extent to which fear of a slave uprising gripped slaveholders and dictated the acts of Southern legislatures. Slaves and free blacks represented a substantial percentage of the population and posed a severe threat to Southern order if they were not kept in their place. According to the 1860 Census, slaves represented one quarter or more of the population in 11 of the 15 slave States, nearly half the population in Alabama, Florida, Georgia, and Louisiana, and more than 50% of the population in Mississippi and South Carolina. Statistics of the United States (Including Mortality, Property, & c.,) in 1860, The Eighth Census 336-350 (1866).
The Southern fear of slave rebellion was not unfounded. Although there were others, two particularly notable slave uprisings heavily influenced slaveholders in the South. In 1822, a group of free blacks and slaves led by Denmark Vesey planned a rebellion in which they would slay their masters and flee to Haiti. H. Aptheker, American Negro Slave Revolts 268-270 (1983). The plan was foiled, leading to the swift arrest of 130 blacks, and the execution of 37, including Vesey. Id., at 271. Still, slaveowners took notice — it was reportedly feared that as many as 6,600 to 9,000 slaves and *845 free blacks were involved in the plot. Id., at 272. A few years later, the fear of rebellion was realized. An uprising led by Nat Turner took the lives of at least 57 whites before it was suppressed. Id., at 298-302.
The fear generated by these and other rebellions led Southern legislatures to take particularly vicious aim at the rights of free blacks and slaves to speak or to keep and bear arms for their defense. Teaching slaves to read (even the Bible) was a criminal offense punished severely in some States. See K. Stampp, The Peculiar Institution: Slavery in the Ante-bellum South 208, 211 (1956). Virginia made it a crime for a member of an “abolition” society to enter the State and argue “that the owners of slaves have no property in the same, or advocate or advise the abolition of slavery.” 1835-1836 Va. Acts eh. 66, p. 44. Other States prohibited the circulation of literature denying a master’s right to property in his slaves and passed laws requiring postmasters to inspect the mails in search of such material. C. Eaton, The Freedom-of-Thought Struggle in the Old South 118-143, 199-200 (1964).
Many legislatures amended their laws prohibiting slaves from carrying firearms[18] to apply the prohibition to free blacks as well. See, e. g., Act of Dec. 23, 1833, § 7, 1833 Ga. Acts pp. 226, 228 (declaring that “it shall not be lawful for any free person of colour in this state, to own, use, or carry fire arms of any description whatever”); H. Aptheker, Nat Turner’s Slave Rebellion 74-76,83-94 (1966) (discussing similar Maryland and Virginia statutes); see also Act of Mar. 15, *846 1852, ch. 206,1852 Miss. Laws p. 328 (repealing laws allowing free blacks to obtain firearms licenses); Act of Jan. 31, 1831, 1831 Fla. Acts p. 30 (same). Florida made it the “duty” of white citizen “patrol[s] to search negro houses or other suspected places, for fire arms.” Act of Feb. 17, 1833, ch. 671, 1833 Fla. Acts pp. 26, 30. If they found any firearms, the patrols were to take the offending slave or free black “to the nearest justice of the peace,” whereupon he would be “severely] punished” by “whipping on the bare back, not exceeding thirty-nine lashes,” unless he could give a “plain and satisfactory” explanation of how he came to possess the gun. Ibid.
Southern blacks were not alone in facing threats to their personal liberty and security during the antebellum era. Mob violence in many Northern cities presented dangers as well. Cottrol & Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Geo. L. J. 309, 340 (1991) (hereinafter Cottrol) (recounting a July 1834 mob attack against “churches, homes, and businesses of white abolitionists and blacks” in New York that involved “upwards of twenty thousand people and required the intervention of the militia to suppress”); ibid, (noting an uprising in Boston nine years later in which a confrontation between a group of white sailors and four blacks led “a mob of several hundred whites” to “attac[k] and severely beat every black they could find”).
c
After the Civil War, Southern anxiety about an uprising among the newly freed slaves peaked. As Representative Thaddeus Stevens is reported to have said, “ ‘[w]hen it was first proposed to free the slaves, and arm the blacks, did not half the nation tremble? The prim conservatives, the snobs, and the male waiting-maids in Congress, were in hysterics.’ ” K. Stampp, The Era of Reconstruction, 1865-1877, p. 104 (1965) (hereinafter Era of Reconstruction).
*847 As the Court explains, this fear led to “systematic efforts” in the “old Confederacy” to disarm the more than 180,000 freedmen who had served in the Union Army, as well as other free blacks. See ante, at 771. Some States formally prohibited blacks from possessing firearms. Ibid, (quoting 1865 Miss. Laws p. 165, §1, reprinted in 1 Fleming 289). Others enacted legislation prohibiting blacks from carrying firearms without a license, a restriction not imposed on whites. See, e. g., La. Statute of 1865, reprinted in id., at 280. Additionally, “[throughout the South, armed parties, often consisting of ex-Confederate soldiers serving in the state militias, forcibly took firearms from newly freed slaves.” Ante, at 772.
As the Court makes crystal clear, if the Fourteenth Amendment “had outlawed only those laws that discriminate on the basis of race or previous condition of servitude, African-Americans in the South would likely have remained vulnerable to attack by many of their worst abusers: the state militia and state peace officers.” Ante, at 779. In the years following the Civil War, a law banning firearm possession outright “would have been nondiscriminatory only in the formal sense,” for it would have “left firearms in the hands of the militia and local peace officers.” Ibid.
Evidence suggests that the public understood this at the time the Fourteenth Amendment was ratified. The publicly circulated Report of the Joint Committee on Reconstruction extensively detailed these abuses, see ante, at 772 (collecting examples), and statements by citizens indicate that they looked to the Committee to provide a federal solution to this problem, see, e. g., 39th Cong. Globe 337 (remarks of Rep. Sumner) (introducing “a memorial from the colored citizens of the State of South Carolina” asking for, inter alia, “constitutional protection in keeping arms, in holding public assemblies, and in complete liberty of speech and of the press”).
One way in which the Federal Government responded was to issue military orders countermanding Southern arms leg *848 islation. See, e. g., Jan. 17, 1866, order from Major General D. E. Sickles, reprinted in E. McPherson, The Political History of the United States of America During the Period of Reconstruction 37 (1871) (“The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed”). The significance of these steps was not lost on those they were designed to protect. After one such order was issued, The Christian Recorder, published by the African Methodist Episcopal Church, published the following editorial:
“‘We have several times alluded to the fact that the Constitution of the United States, guaranties to every citizen the right to keep and bear arms. ... All men, without the distinction of color, have the right to keep arms to defend their homes, families, or themselves.’
“We are glad to learn that [the] Commissioner for this State . . . has given freedmen to understand that they have as good a right to keep fire arms as any other citizens. The Constitution of the United States is the supreme law of the land, and we will be governed by that at present.” Right To Bear Arms, Phila., Pa., Christian Recorder, Feb. 24, 1866, pp. 29-30.
The same month, The Loyal Georgian carried a letter to the editor asking, “Have colored persons a right to own and carry fire arms? — A Colored Citizen.” The editors responded as follows:
“Almost every day, we are asked questions similar to the above. We answer certainly you have the same right to own and carry fire arms that other citizens have. You are not only free but citizens of the United States and, as such, entitled to the same privileges granted to other citizens by the Constitution of the United States.
“ ... Article II, of the amendments to the Constitution of the United States, gives the people the right to bear *849 arms and states that this right shall not be infringed---All men, without distinction of color, have the right to keep arms to defend their homes, families or themselves.” Letter to the Editor, Augusta, Ga., Loyal Georgian, Feb. 3, 1866, p. 3.
These statements are consistent with the arguments of abolitionists during the antebellum era that slavery, and the slave States’ efforts to retain it, violated the constitutional rights of individuals — rights the abolitionists described as among the privileges and immunities of citizenship. See, e. g., J. Tiffany, Treatise on the Unconstitutionality of American Slavery 56 (1849) (“pledging] ... to see that all the rights, privileges, and immunities, granted by the constitution of the United States, are extended to all”); id., at 99 (describing the “right to keep and bear arms” as one of those rights secured by “the constitution of the United States”). The problem abolitionists sought to remedy was that, under Dred Scott, blacks were not entitled to the privileges and immunities of citizens under the Federal Constitution and that, in many States, whatever inalienable rights state law recognized did not apply to blacks. See, e. g., Cooper v. Savannah, 4 Ga. 68, 72 (1848) (deciding, just two years after Chief Justice Lumpkin’s opinion in Nunn recognizing the right to keep and bear arms, see supra, at 842, that “[f]ree persons of color have never been recognized here as citizens; they are not entitled to bear arms”).
Section 1 guaranteed the rights of citizenship in the United States and in the several States without regard to race. But it was understood that liberty would be assured little protection if § 1 left each State to decide which privileges or immunities of United States citizenship it would protect. As Frederick Douglass explained before §l’s adoption, “the Legislatures of the South can take from him the right to keep and bear arms, as they can — they would not allow a negro to walk with a cane where I came from, they would not allow five of them to assemble together.” In *850 What New Skin Will the Old Snake Come Forth? An Address Delivered in New York, New York, on May 10, 1865, reprinted in 4 The Frederick Douglass Papers 79, 83-84 (J. Blassingame & J. McKivigan eds. 1991) (footnote omitted). “Notwithstanding the provision in the Constitution of the United States that the right to keep and bear arms shall not be abridged,” Douglass explained that “the black man has never had the right either to keep or bear arms.” Id., at 84. Absent a constitutional amendment to enforce that right against the States, he insisted that “the work of the Abolitionists [wa]s not finished.” Ibid.
This history confirms what the text of the Privileges or Immunities Clause most naturally suggests: Consistent with its command that “[n]o State shall . . . abridge” the rights of United States citizens, the,Clause establishes a minimum baseline of federal rights, and the constitutional right to keep and bear arms plainly was among them.[19]
Ill
My conclusion is contrary to this Court’s precedents, which hold that the Second Amendment right to keep and bear arms is not a privilege of United States citizenship. See Cruikshank, 92 U. S., at 548-549, 551-553. I must, therefore, consider whether stare decisis requires retention of those precedents. As mentioned at the outset, my inquiry is limitéd to the right at issue here. Thus, I do not endeavor to decide in this case whether, or to what extent, the Privileges or Immunities Clause applies any other rights enumer *851 ated in the Constitution against the States.[20] Nor do I suggest that the stare decisis considerations surrounding the application of the right to keep and bear arms against the States would be the same as those surrounding another right protected by the Privileges or Immunities Clause. I consider stare decisis only as it applies to the question presented here.
A
This inquiry begins with the Slaughter-House Cases. There, this Court upheld a Louisiana statute granting a monopoly on livestock butchering in and around the city of New Orleans to a newly incorporated company. 16 Wall. 36. Butchers excluded by the monopoly sued, claiming that the statute violated the Privileges or Immunities Clause because it interfered with their right to pursue and “exercise their trade.” Id., at 60. This Court rejected the butchers’ claim, holding that their asserted right was not a privilege or immunity of American citizenship, but one governed by the States alone. The Court held that the Privileges or Immunities Clause protected only rights of federal citizenship— those “which owe their existence to the Federal government, its National character, its Constitution, or its laws,” id., at 79 — and did not protect any of the rights of state citizenship, *852 id., at 74. In other words, the Court defined the two sets of rights as mutually exclusive.
After separating these two sets of rights, the Court defined the rights of state citizenship as “embrac[ing] nearly every civil right for the establishment and protection of which organized government is instituted” — that is, all those rights listed in Corfield. 16 Wall., at 76 (referring to “those rights” that “Judge Washington” described). That left very few rights of federal citizenship for the Privileges or Immunities Clause to protect. The Court suggested a handful of possibilities, such as the “right of free access to [federal] seaports,” protection of the Federal Government while traveling “on the high seas,” and even two rights listed in the Constitution. Id., at 79 (noting “[t]he right to peaceably assemble” and “the privilege of the writ of habeas corpus”)-, see supra, at 808. But its decision to interpret the rights of state and federal citizenship as mutually exclusive led the Court in future cases to conclude that constitutionally enumerated rights were excluded from the Privileges or Immunities Clause’s scope. See Cruikshank, supra.
I reject that understanding. There was no reason to interpret the Privileges or Immunities Clause as putting the Court to the extreme choice of-interpreting the “privileges and immunities” of federal citizenship to mean either all those rights listed in Corfield, or almost no rights at all. 16 Wall., at 76. The record is scant that the public understood the Clause to make the Federal Government “a perpetual censor upon all legislation of the States” as the SlaughterHouse majority feared. Id., at 78. For one thing, Corfield listed the “elective franchise” as one of the privileges and immunities of “citizens of the several states,” 6 F. Cas., at 552, yet Congress and the States still found it necessary to adopt the Fifteenth Amendment — which protects “[t]he right of citizens of the United States to vote” — two years after the Fourteenth Amendment’s passage. If the Privileges or Immunities Clause were understood to protect every *853 conceivable civil right from state abridgment, the Fifteenth Amendment would have been redundant.
The better view, in light of the States and Federal Government’s shared history of recognizing certain inalienable rights in their citizens, is that the privileges and immunities of state and federal citizenship overlap. This is not to say that the privileges and immunities of state and federal citizenship are the same. At the time of the Fourteenth Amendment’s ratification, States performed many more functions than the Federal Government, and it is unlikely that, simply by referring to “privileges or immunities,” the Framers of § 1 meant to transfer every right mentioned in Corjield to congressional oversight. As discussed, “privileges” and “immunities” were understood only as synonyms for “rights.” See supra, at 813-815. It was their attachment to a particular group that gave them content, and the text and history recounted here indicate that the rights of United States citizens were not perfectly identical to the rights of citizens “in the several States. ” Justice Swayne, one of the dissenters in Slaughter-House, made the point clear:
“The citizen of a State has the same fundamental rights as a citizen of the United States, and also certain others, local in their character, arising from his relation to the State, and in addition, those which belong to the citizen of the United States, he being in that relation also. There may thus be a double citizenship, each having some rights peculiar to itself. It is only over those which belong to the citizen of the United States that the category here in question throws the shield of its protection.” 16 Wall., at 126 (emphasis added).
Because the privileges and immunities of American citizenship include rights enumerated in the Constitution, they overlap to at least some extent with the privileges and immunities traditionally recognized in citizens in the several States.
*854 A separate question is whether the privileges and immunities of American citizenship include any rights besides those enumerated in the Constitution. The four dissenting Justices in Slaughter-House would have held that the Privileges or Immunities Clause protected the unenumerated right that the butchers in that case asserted. See id., at 83 (opinion of Field, J.); id., at 111 (opinion of Bradley, J.); id., at 124 (opinion of Swayne, J.). Because this case does not involve an unenumerated right, it is not necessary to resolve the question whether the Clause protects such rights, or whether the Court’s judgment in Slaughter-House was correct.
Still, it is argued that the mere possibility that the Privileges or Immunities Clause may enforce unenumerated rights against the States creates “‘special hazards’” that should prevent this Court from returning to the original meaning of the Clause.[21] Post, at 860 (Stevens, J, dissenting). Ironically, the same objection applies to the Court’s substantive due process jurisprudence, which illustrates the risks of granting judges broad discretion to recognize individual constitutional rights in the absence of textual or historical guideposts. But I see no reason to assume that such hazards apply to the Privileges or Immunities Clause. The mere fact that the Clause does not expressly list the rights it protects does not render it incapable of principled judicial application. The Constitution contains many provisions that require an examination of more than just constitutional text to determine whether a particular act is within Congress’ power or is otherwise prohibited. See, e. g., Art. I, § 8, cl. 18 (Necessary and Proper Clause); Arndt. 8 (Cruel and *855 Unusual Punishments Clause). When the inquiry focuses on what the ratifying era understood the Privileges or Immunities Clause to mean, interpreting it should be no more “hazardous” than interpreting these other constitutional provisions by using the same approach. To be sure, interpreting the Privileges or Immunities Clause may produce hard questions. But they will have the advantage of being questions the Constitution asks us to answer. I believe those questions are more worthy of this Court’s attention — and far more likely to yield discernible answers — than the substantive due process questions the Court has for years created on its own, with neither textual nor historical support.
Finding these impediments to returning to the original meaning overstated, I reject Slaughter-House insofar as it precludes any overlap between the privileges and immunities of state and federal citizenship. I next proceed to the stare decisis considerations surrounding the precedent that expressly controls the question presented here.
B
Three years after Slaughter-House, the Court in Cruikshank squarely held that the right to keep and bear arms was not a privilege of American citizenship, thereby overturning the convictions of militia members responsible for the brutal Colfax Massacre. See supra, at 808-809. Cruikshank is not a precedent entitled to any respect. The flaws in its interpretation of the Privileges or Immunities Clause are made evident by the preceding evidence of its original meaning, and I would reject the holding on that basis alone. But, the consequences of Cruikshank warrant mention as well.
Cruikshank’s holding that blacks could look only to state governments for protection of their right to keep and bear arms enabled private forces, often with the assistance of local governments, to subjugate the newly freed slaves and their descendants through a wave of private violence designed to drive blacks from the voting booth and force them *856 into peonage, an effective return to slavery. Without federal enforcement of the inalienable right to keep and bear arms, these militias and mobs were tragically successful in waging a campaign of terror against the very people the Fourteenth Amendment had just made citizens.
Take, for example, the Hamburg Massacre of 1876. There, a white citizen militia sought out and murdered a troop of black militiamen for no other reason than that they had dared to conduct a celebratory Fourth of July parade through their mostly black town. The white militia commander, “Pitchfork” Ben Tillman, later described this massacre with pride: “[T]he leading white men of Edgefield” had decided “to seize the first opportunity that the negroes might offer them to provoke a riot and teach the negroes a lesson by having the whites demonstrate their superiority by killing as many of them as was justifiable.” S. Kantrowitz, Ben Tillman & the Reconstruction of White Supremacy 67 (2000) (ellipsis, brackets, and internal quotation marks omitted). None of the perpetrators of the Hamburg murders was ever brought to justice.[22]
Organized terrorism like that perpetuated by Tillman and his cohorts proliferated in the absence of federal enforcement of constitutional rights. Militias such as the Ku Klux Klan, the Knights of the White Camellia, the White Brotherhood, the Pale Faces, and the ’76 Association spread terror among blacks and white Republicans by breaking up Republican meetings, threatening political leaders, and whipping black militiamen. Era of Reconstruction 199-200; Curtis *857 156. These groups raped, murdered, lynched, and robbed as a means of intimidating, and instilling pervasive fear in, those whom they despised. A. Trelease, White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction 28-46 (1995).
Although Congress enacted legislation to suppress these activities,[23] Klan tactics remained a constant presence in the lives of Southern blacks for decades. Between 1882 and 1968, there were at least 3,446 reported lynchings of blacks in the South. Cottrol 351-352. They were tortured and killed for a wide array of alleged crimes, without even the slightest hint of due process. Emmit Till, for example, was killed in 1955 for allegedly whistling at a white woman. S. Whitfield, A Death in the Delta: The Story of Emmett Till 15-31 (1988). The fates of other targets of mob violence were equally depraved. See, e. g., Lynched Negro and Wife Were First Mutilated, Vicksburg (Miss.) Evening Post, Feb. 8,1904, reprinted in R. Ginzburg, 100 Years of Lynchings 63 (1988); Negro Shot Dead for Kissing His White Girlfriend, Chicago Defender, Feb. 31, 1915, in id., at 95 (reporting incident in Florida); La. Negro Is Burned Alive Screaming "I Didn’t Do It,” Cleveland Gazette, Dec. 13, 1914, in id., at 93 (reporting incident in Louisiana).
The use of firearms for self-defense was often the only way black citizens could protect themselves from mob violence. As Eli Cooper, one target of such violence, is said to have explained, “[t]he 'Negro has been run over for fifty years, but it must stop now, and pistols and shotguns are the only weapons to stop a mob.’” Church Burnings Follow Negro Agitator’s Lynching, Chicago Defender, Sept. 6, 1919, in id., at 124. Sometimes, as in Cooper’s case, self-defense did not succeed. He was dragged from his home by a mob and *858 killed as Ms wife looked on. Ibid. But at other times, the use of firearms allowed targets of mob violence to survive. One man recalled the mght during his childhood when his father stood armed at a jail until morning to ward off lynchers. See Cottrol 354. The experience left him with a sense, “not ‘of powerlessness, but of the “possibilities of salvation” ’ ” that came from standing up to intimidation. Ibid.
In my view, the record makes plain that the Framers of the Privileges or Immunities Clause and the ratifying-era public understood — just as the Framers of the Second Amendment did — that the right to keep and bear arms was essential to the preservation of liberty. The record makes equally plain that they deemed this right necessary to include in the mimmum baseline of federal rights that the Privileges or Immunities Clause established in the wake of the war over slavery. There is nothing about Cruikshank’s contrary holding that warrants its retention.
* * *
I agree with the Court that the Second Amendment is fully applicable to the States. I do so because the right to keep and bear arms is guaranteed by the Fourteenth Amendment as a privilege of American citizenship.

 In the two decades after United States v. Cruikshank, 92 U. S. 542 (1876), was decided, this Court twice reaffirmed its holding that the Privileges or Immunities Clause does not apply the Second Amendment to the States. Presser v. Illinois, 116 U. S. 252, 266-267 (1886); Miller v. Texas, 153 U. S. 535 (1894).

 See also 2 C. Richardson, A New Dictionary of the English Language 1512 (1839) (defining “privilege” as “an appropriate or peculiar law or rule or right; a peculiar immunity, liberty, or franchise”); 1 id., at 1056 (defining “immunity” as “[f]reedom or exemption, (from duties,) liberty, privilege”); The Philadelphia School Dictionary; or Expositor of the English Language 152 (3d ed. 1812) (defining “privilege” as a “peculiar advantage”); id., at 105 (defining “immunity” as “privilege, exemption”); Royal Standard English Dictionary 411 (1788) (defining “privilege” as “public right, peculiar advantage”).

 See also, e. g., First Charter of Va. (1606), reprinted in 7 Federal and State Constitutions, Colonial Charters, and Other Organic Laws 3783, 3788 (F. Thorpe ed. 1909) (hereinafter Thorpe) (“Declar[ing]” that “all and every the Persons being our Subjects,... shall have and enjoy all Liberties, Franchises, and Immunities ... as if they had been abiding and born, within this our Realm of England” (emphasis in original)); Charter of New England (1620), in 3 id., at 1827, 1839 (“[A]ll and every the Persons, beinge our Subjects, . . . shall have and enjoy all Liberties, and ffranchizes, and Immunities of free Denizens and naturall Subjects ... as if they had been abidinge and born within this our Kingdome of England”); Charter of Mass. Bay (1629), in id., at 1846, 1856-1857 (guaranteeing that “all and every the Subjects of Us,... shall have and enjoy all liberties and Immunities of free and naturall Subjects . . . as yf they and everie of them were borne within the Realme of England”); Grant of the Province of Me. (1639), in id., at 1625, 1635 (guaranteeing “Liberties Francheses and Immunityes of or belonging to any the naturall borne subjects of this our Kingdome of England”); Charter of Carolina (1663), in 5 id., at 2743, 2747 (guaranteeing to all subjects “all liberties franchises and priviledges of this our kingdom of England”); Charter of R. I. and Providence Plantations (1663), in 6 id., at 3211, 3220 (“[A]ll and every the subjects of us ... shall have and enjoye all libertyes and immunityes of ffree and naturall subjects within any the dominions of us, our heires, or successours, ... as if they, and every of them, were borne within the realme of England”); Charter of Ga. (1732), *817 in 2 id., at 765, 773 (“[A]ll and every the persons which shall happen to be born within the said province . .. shall have and enjoy all liberties, franchises and immunities of free denizens and natural born subjects, within any of our dominions, to all intents and purposes, as if abiding and born within this our kingdom of Great-Britain”).

 See also, e. g., A. Howard, The Road from Runnymede: Magna Carta and Constitutionalism in America 174 (1968) (quoting 1774 Georgia resolution declaring that the Colony’s inhabitants were entitled to “ ‘the same rights, privileges, and immunities with their fellow-subjects in Great Britain”’ (emphasis in original)); The Virginia Resolves, Resolutions as Printed in the Journal of the House of Burgesses, reprinted in Prologue to Revolution: Sources and Documents on the Stamp Act Crisis, 1764-1766, at 46,48 (“[T]he Colonists aforesaid are declared entitled to all Liberties, Privileges, and Immunities of Denizens and natural Subjects, to all Intents and Purposes, as if they had been abiding and born within the Realm of England” (emphasis in original)).

 See also Va. Declaration of Rights (1776), reprinted in 1 Schwartz 234-236; Pa. Declaration of Rights (1776), in id,., at 263-275; Del. Declaration of Rights (1776), in id., at 276-278; Md. Declaration of Rights (1776), in id., at 280-285; N. C. Declaration of Rights (1776), in id., at 286-288.

 Justice Washington’s complete list was as follows:
“Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the *821 government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state; may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental: to which may be added, the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised.” 6 K Cas., at 551-552.

 See also Treaty Between the United States of America and the Ottawa Indians of Blanchard’s Fork and Roche De Boeuf, June 24, 1862, 12 Stat. 1237 (“The Ottawa Indians of the United Bands of Blanchard’s Fork and of Roche de Boeuf, having become sufficiently advanced in civilization, and being desirous of becoming citizens of the United States . . . [after five years from the ratification of this treaty] shall be deemed and declared to be citizens of the United States, to all intents and purposes, and shall be entitled to all the rights, privileges, and immunities of such citizens” (emphasis added)); Treaty Between the United States of America and Different Tribes of Sioux Indians, Art. VI, April 29,1868,15 Stat. 637 (“[A]ny Indian or Indians receiving a patent for land under the foregoing provisions, shall thereby and from thenceforth become and be a citizen of the United States, and be entitled to all the privileges and immunities of such citizens” (emphasis added)).

 Subsequent treaties contained similar guarantees that the inhabitants of the newly acquired Territories would enjoy the freedom to exercise certain constitutional rights. See Treaty of Peace, Friendship, Limits, and Settlement with the Republic of Mexico, Art. IX, Feb. 2,1848, 9 Stat. 930, T. S. No. 207 (cession of Texas) (declaring that inhabitants of the Territory were entitled “to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution; and in the mean time shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction”); Treaty concerning the Cession of the Russian Possessions in North America by his Majesty the Emperor of all the Russias to the United States of America, Art. III, Mar. 30, 1867, 15 Stat. 542, T. S. No. 301 (June 20, 1867) (cession of Alaska) (“The inhabitants of the ceded territory,... if they should prefer to remain in the ceded territory, they, *825 with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion”).

 See, e. g., Speech of Mr. Joseph Hemphill (Pa.) on the Missouri Question in the House of Representatives 16 (1820), as published in pamphlet form and reprinted in 22 Moore Pamphlets, p. 16 (“If the right to hold slaves is a federal right and attached merely to citizenship of the United States, [then slavery] could maintain itself against state authority, and on this principle the owner might take his slaves into any state he pleased, in defiance of the state laws, but this would be contrary to the constitution”); see also Lash, The Origins of the Privileges or Immunities Clause, Part I: “Privileges and Immunities” as an Antebellum Term of Art, 98 Geo. L. J. 1241, 1288-1290 (2010) (collecting other examples).

 One Country, One Constitution, and One People: Speech of Hon. John A. Bingham, of Ohio, In the House of Representatives, February 28,1866, In Support of the Proposed Amendment To Enforce the Bill of Rights (Cong. Globe). The pamphlet was published by the official reporter of congressional debates, and was distributed presumably pursuant to the congressional franking privilege. See .Wildenthal, Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866-67, 68 Ohio St. L. J. 1509, 1558, n. 167 (2007) (hereinafter Wildenthal).

 The full text of Bingham’s first draft of § 1 provided as follows:
“The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property.” 39th Cong. Globe 1088.

 In a separate front-page article on the same day, the paper expounded upon Hale’s arguments in even further detail, while omitting Bingham’s chief rebuttals. N. Y. Times, Feb. 28, 1866, p. 1. The unbalanced nature of The New York Times’ coverage is unsurprising. As scholars have noted, “[m]ost papers” during the time of Reconstruction “had a frank partisan slant . . . and the Times was no exception.” Wildenthal 1559. In 1866, the paper “was still defending” President Johnson’s resistance to Republican reform measures, as exemplified by the fact that it “supported Johnson’s veto of the Civil Rights Act of 1866.” Ibid.

 Other papers that covered Howard’s speech include the following: Baltimore Gazette, May 24, 1866, p. 4; Boston Daily Journal, May 24, 1866, p. 4; Boston Daily Advertiser, May 24, 1866, p. 1; Daily National Intelligencer, May 24, 1866, p. 3. Springfield Daily Republican, May 24, 1866, p. 3; Charleston Daily Courier, May 28, 1866, p. 4; Charleston Daily Cou *833 rier, May 29, 1866, p. 1; Chicago Tribune, May 29, 1866, p. 2; Philadelphia Inquirer, May 24, 1866, p. 8.

 See J. Pomeroy, An Introduction to the Constitutional Law of the United States 155-156 (E. Bennett ed. 1886) (describing §1, which the country was then still considering, as a “needed” “remedy” for Barron ex *837 rel. Tiernan v. Mayor of Baltimore, 7 Pet. 243 (1833), which held that the Bill of Rights was not enforceable against the States); T. Farrar, Manual of the Constitution of the United States of America 58-59, 145-146, 395-397 (1867); id., at 546 (3d ed. 1872) (describing the Fourteenth Amendment as having “swept away” the “decisions of many courts” that “the popular rights guaranteed by the Constitution are secured only against [the federal] government”).

 The municipal respondents and Justice Breyer’s dissent raise a most unusual argument that §1 prohibits discriminatory laws affecting only the right to keep and bear arms, but offers substantive protection to other rights enumerated in the Constitution, such as the freedom of speech. See post, at 935. Others, however, have made the more comprehensive — and internally consistent — argument that § 1 bars discrimination alone and does not afford protection to any substantive rights. See, e. g., R. Berger, Government by Judiciary: The Transformation of the Fourteenth Amendment (2d ed. 1997). I address the coverage of the Privileges or Immunities Clause only as it applies tó the Second Amendment right presented here, but I do so with the understanding that my conclusion may have implications for the broader argument.

 See, e.g., Raleigh & Gaston R. Co. v. Davis, 19 N. C. 451, 458-462 (1837) (right to just compensation for government taking of property); Rohan v. Sawin, 59 Mass. 281, 285 (1850) (right to be secure from unreasonable government searches and seizures); State v. Buzzard, 4 Ark. 18, 28 (1842) (right to keep and bear arms); State v. Jumel, 13 La. Ann. 399, 400 (1858) (same); Cockrum v. State, 24 Tex. 394, 401-404 (1859) (same).

 See, e. g., People v. Goodwin, 18 Johns. *187, *201 (N. Y. Sup. Ct. 1820); Rhinehart v. Schuyler, 7 Ill. 473, 522 (1845).

 See, e. g., Black Code, ch. 33, § 19, 1806 Acts of First Session of Territory of Orleans pp. 160, 162 (prohibiting slaves from using firearms unless they were authorized by their master to hunt within the boundaries of his plantation); An Act to Provide for the More Effectual Performance of Patrol Duty, 1819 S. C. Acts pp. 29, 31 (same); An Act to Amend the Sixth Section of an Act Entitled “An Act Concerning Slaves,” approved 5th Feb., 1840, Tex. Laws, 3d Sess., pp. 42-43 (making it unlawful for “any slave to own firearms of any description”).

 I conclude that the right to keep and bear arms applies to the States through the Privileges or Immunities Clause, which recognizes the rights of United States “citizens.” The plurality concludes that the right applies to the States through the Due Process Clause, which covers all “person[s].” Because this case does not involve a claim brought by a noncitizen, I express no view on the difference, if any, between my conclusion and the plurality’s with respect to the extent to which the States may regulate firearm possession by noncitizens.

 I note, however, that I see no reason to assume that the constitutionally enumerated rights protected by the Privileges or Immunities Clause should consist of all the rights recognized in the Bill of Rights and no others. Constitutional provisions outside the Bill of Rights protect individual rights, see, e. g., Art. I, § 9, cl. 2 (granting the “Privilege of the Writ of Habeas Corpus”), and there is no obvious evidence that the Framers of the Privileges or Immunities Clause meant to exclude them. In addition, certain Bill of Rights provisions prevent federal interference in state affairs and are not readily construed as protecting rights that belong to individuals. The Ninth and Tenth Amendments are obvious examples, as is the First Amendment’s Establishment Clause, which “does not purport to protect individual rights.” Elk Grove Unified School Dist. v. Newdow, 542 U. S. 1, 50 (2004) (Thomas, J., concurring in judgment); see Amar 179-180.

 To the extent Justice Stevens is concerned that reliance on the Privileges or Immunities Clause may invite judges to “write their personal views of appropriate public policy into the Constitution,” post, at 860 (internal quotation marks omitted), his celebration of the alternative— the “flexibility,” “transcend[ence],” and “dynamism” of substantive due process — speaks for itself, post, at 871, 872, 876.

 Tillman went on to a long career as South Carolina’s Governor and, later, United States Senator. Tillman’s contributions to campaign finance law have been discussed in our recent eases on that subject. See Citizens United v. Federal Election Comm’n, 558 U. S. 310, 394-395, 433, 446, 476 (2010) (Stevens, J., concurring in part and dissenting in part) (discussing at length the Tillman Act of 1907, ch. 420, 34 Stat. 864). His contributions to the culture of terrorism that grew in the wake of Cruikshank had an even more dramatic and tragic effect.

 In an effort to enforce the Fourteenth Amendment and halt this violence, Congress enacted a series of civil rights statutes, including the Force Acts, see Act of May 31,1870, 16 Stat. 140; Act of Feb. 28, 1871, 16 Stat. 433, and the Ku Klux Klan Act, see Act of Apr. 20, 1871, 17 Stat. 13.